

FILED

2022 Aug-03  PM 02:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

LINDSAY DAVIS,                )
BENJAMIN DAVIS,               )
                             )
       Plaintiffs,            )
                             )
v.                           )          **7:17-cv-01533-LSC**
                             )
J. MICHAEL WHITE, *et al.*,   )
                             )
       Defendants.           )
                             )
                             )
NICOLE SLONE and             )
JONATHAN SLONE,              )
                             )
       Plaintiffs,           )
                             )
v.                           )          **7:17-cv-01534-LSC**
                             )
J. MICHAEL WHITE, et al.,     )
                             )
       Defendants.           )
                             )
MONICA LAWRENCE and          )
JOHN LAWRENCE,               )
                             )
       Plaintiffs,           )
                             )
v.                           )          **7:17-cv-01535-LSC**
                             )
J. MICHAEL WHITE, et al.,     )
                             )
       Defendants            )

**MEMORANDUM OF OPINION AND ORDER**

Before the Court is Defendants' Motion for Remittitur in the combined cases, consisting of the Davis, Sloane, and Lawrence Plaintiffs. Defendants submitted a Motion for Remittitur on May 5, 2022, and Plaintiffs submitted their responses on May 13, 2022. (Doc. 231 and Doc. 234). Upon consideration, and for the reasons set forth herein, the motion is due to be denied.

## I.    STANDARD OF REVIEW

In the Eleventh Circuit, a court may order remittitur and reduce the punitive damages awarded by the jury. The remedy for a damages award that is "outside the bounds of evidence is for the 'district court [to] reduce the award to the maximum amount established by the evidence.'" *Hicks v. City of Tuscaloosa*, 2016 WL 1180119, at *7 (N.D. Ala., 2016) (quoting *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1268 (11th Cir. 2008); *Sand v. Kawasaki Motors Corp. U.S.A.,* 513 Fed. Appx. 847, 855 (11th Cir. 2013) ("In general, a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence.") (quoting *Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435, 1448 (11th Cir. 1985)). Therefore, if legal error is detected in an award of damages, a court may opt for remittitur to remedy instead of granting a new trial.

## II.    ANALYSIS

The punitive damages for each claim that Defendants address in their Motion are as follows. The Sloane Plaintiffs were awarded $1.00 in nominal damages and $30,000.00 in punitive damages on their Trespass claim; $1.00 in nominal damages and $105,500.00 in punitive damages on their Private Nuisance claim; $1.00 in nominal damages and $665,000.00 in punitive damages on their Deprivation of property rights claim; and $100,000.00 in compensatory damages and $500,000.00 in punitive damages on their Outrage claim. The jury awarded the Davis Plaintiffs $1.00 in nominal damages and $375,000.00 in punitive damages on their §1983 claim; $1.00 in nominal damages and $30,000.00 on their Trespass claim; and $100,000 in compensatory damages and $1,000,000.00 in punitive damages on their Outrage claim. The jury awarded the Lawrence Plaintiffs $1.00 in nominal damages and $450,000.00 in punitive damages on their §1983 claim; $1.00 in nominal damages and $30,000.00 on their Trespass claim; $1.00 in nominal damages and $5,500.00 in punitive damages for their Private Nuisance claim: $1.00 in nominal damages and $702,000.00 in punitive damages on their Deprivation of Property Rights claim; and $100,000.00 in compensatory damages and $500,000.00 in punitive damages on their Outrage claim.

There are three issues for the Court to determine: (1) whether the punitive damages for the federal claims are excessive under the *Gore* and *State Farm* factors; (2) whether the punitive damages for the state law claims are excessive under both *Gore/State Farm* and the *Hammond/Green Oil* factors; and (3) whether Defendants' businesses are small businesses under Ala. Code § 6-11-21(c).

### A. Punitive Damages Under Federal Law

Excessive punitive damage awards against a tortfeasor for violations of state law violate the Due Process Clause under the Fourteenth Amendment and excessive punitive damages for violations of federal law violate the Due Process Clause under the Fifth Amendment. When considering the amount of punitive damages, the Supreme Court's factors in *Gore* and *State Farm* apply. Those factors examine: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). Because all federal and state claims arise from the same actions by Defendants, the Court will analyze the factors for all claims together when appropriate.

### 1. Degree of Reprehensibility

The first factor, reprehensibility, is the most important factor when determining if the amount of punitive damages violated due process concerns. *BMW of North America v. Gore*, 517 U.S. 559 (1996). Here, Defendants ask this Court to interpret such a requirement very narrowly, asking for a showing of "intentional malice, trickery, [or] deceit." (Doc. 199.) Defendants also state that due to the lack of multiple incidents per Plaintiff, Defendants' actions are not reprehensible. The Court disagrees. The 11th Circuit recognizes a broader definition of reprehensibility, considering factors such as whether the conduct evinced an indifference to or a reckless disregard for the health or safety of others, as well as whether the target of the conduct was financially vulnerable. *Goldsmith v. Baby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008).

Defendants' actions were nothing but reprehensible. Defendants' actions had serious, lingering effects on Plaintiffs. Defendants' actions prevented Plaintiffs from accessing essential utilities without regard for Plaintiffs' due process rights. Defendants cut off Plaintiffs' utilities to strong arm payment of clearly invalid charges. Defendants insisted on ignoring partial payments and accruing an excessive sum. And Defendants threatened foreclosure and criminal prosecution if Plaintiffs did not pay the unsupportable and excessive fees. As a result, Plaintiffs suffered serious harm. Considering the amount of the invalid charges levied by the defendants

and the financial position of Plaintiffs, Defendants' suggestion that this conduct did not affect financially vulnerable targets is clearly misplaced. The factors in *Goldsmith* regarding reprehensibility confirm the punitive damages are not excessive.

2. Proportionality

a) Proportionality of Federal Claims

When determining whether an award of damages is excessive, the court should also look to the proportionality of the awarded damages to the amount of harm. *Gore,* 517 U.S., at 575. When making this comparison, the Court should compare the amount of awarded damages to the actual harm that has occurred, not necessarily compare the awarded compensatory damages to the amount of awarded punitive damages. *SE Prop. Holdings, LLC v. Judkins*, 822 F. App'x 929, 937 (11th Cir. 2020). For the 1983 claims, this analysis is the most rational approach, even though Defendants ask the Court to compare the punitive damages to the awarded *nominal damages*. Such comparison results in a ratio of 375,000:1 and 450,000:1 for each Defendant. (Doc. 231). That approach misconstrues the *Gore* factor. The 11th Circuit has not *specifically* addressed whether the Court should compare punitive damages to nominal damages like Defendants propose. However, in *Kemp*, the 11th Circuit allowed a 23:1 ratio to stand, stating that a court should not rigidly rely on the ratio when reliance on the ratio would subvert traditional purposes of punitive

damages. *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364–65 (11th Cir. 2004). Further, sound logic and the disapproval of Defendants' theory in Alabama state courts as well as the 2nd, 3rd, 4th, 5th, 6th, and 9th Circuits suggests that Defendant's argument is misplaced. *Tanner v. Ebbole*, 88 So. 3d 856, 876 (Ala. Civ. App. 2011); *Patterson v. Balsamico*, 440 F.3d 104, 121 (2d Cir. 2006); *Jester v. Hutt*, 937 F.3d 233, 242 (3d Cir. 2019); *Saunders v. Branch Banking and Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008); *Williams v. Kaufman Cnty.*, 352 F.3d 994 (5th Cir. 2003); *Romanski v. Detroit Ent., L.L.C.*, 428 F.3d 629 (6th Cir. 2005); *Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014).

As the *Gore* and *Judkins* courts discussed, a better measurement would be the actual harm suffered by Plaintiffs. Here, when compared to the amount that Defendants claimed Davis and Lawrence owed, the ratio becomes a multiple of 2.82 for the Davises ($133,085.68 to $375,000) and 2.72 for the Lawrences ($165,502.94 to $450,000), both of which are well within the *Gore* guideposts. (Doc 208). As Plaintiffs point out, the excessive charges and collection tactics form the basis of the suit, both of which resulted in the 1983 claims. (*Id.*) Regardless of how one measures the actual harm suffered by Plaintiffs, the Court finds that the punitive damages are proportional.

### b) Proportionality of State Law Claims

All punitive damages awarded for Plaintiffs' state law claims are proportional. For the Outrage claims, the only claim where compensatory damages were awarded, the compensatory-punitive damages were 10:1 for the Davises and 5:1 for the Slones and Lawrences. Defendant concedes that the ratios for the Outrage claims are not grossly disproportionate. (Doc. 231 at 4 n. 1 ("The ratios range in grossly disproportionate numbers in all claims with the exception of the Outrage claim . . . .")

For Plaintiffs' Trespass, Private Nuisance, and Deprivation of Property Right claims, Defendants argue that the punitive damages were grossly disproportionate because the jury only awarded $1 in nominal damages. For the reasons discussed above as to the federal law claims, the Court finds the punitive damages awarded for the state law claims to be proportional. When looking at the amount Defendants alleged each Plaintiff owed and the reprehensible actions of Defendants, the amount given for each claim to each plaintiff is proportional for the state law claims.

### 3. Comparing Civil Penalties

The third factor instructs the Court to analyze the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Here, Plaintiff concedes that there is no law providing for the imposition of civil or criminal penalties for the conduct at issue. As a result, this

factor seems to weigh in favor of Defendants. However, the circumstances of this case are unique. Here, Defendants positioned themselves in the roll of a government entity—except a government entity would be regulated by ordinances or statutes and thus prevented from imposing clearly outrageous rates and fees. A government regulated utility would also be required to provide Plaintiffs due process. Instead, Defendants utilized unbridled authority to ravage the Plaintiffs, stripping them of basic rights with no due process. There is no comparable civil or criminal penalty because most, if not all, other utility companies would be prevented from acting in such a manner. These Defendants' actions were completely unchecked, and as such, this factor does not signal for a reduction in the jury's award of damages.

Even if this factor favored a reduction, one factor weighing in favor of a reduction when the other factors weigh against it is not enough to overturn the jury's award of punitive damages. There is no reason to reduce the punitive damages.

### B. Punitive Damages Under Alabama Law

Alabama caps punitive damages at the greater of either three times compensatory damages or five hundred thousand dollars. Ala. Code § 6-11-21(a). Here, no Plaintiff received more than $500,000 in punitive damages per claim from any Defendant; therefore, § 6-11-21(a)'s cap does not apply.

Further, under Alabama law, when determining whether the punitive damages for the state law claims are excessive, the Court looks to the *Gore* guideposts, and the guidelines set out in *Hammond v. City of Gadsden* and *Green Oil v. Hornsby*. Under Alabama law, the Court looks to the following factors when determining if punitive damages are excessive: (1) the "reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually occurred"; (2) "the degree of reprehensibility of the defendant's conduct . . . including the duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or 'cover-up' of that hazard, and the existence and frequency of similar past conduct" (3) if the wrongful conduct was profitable to the defendant; (4) the financial position of the defendant; (5) the cost of litigation; (6) if criminal sanctions have been imposed; and  (7) if there have been other civil actions against the same defendant based on the same conduct." *Green Oil Co. v. Hornsby*, 539 So. 2d 218, 224 (Ala. 1989). In addition, Courts may also look to: the nature and the extent of any effort the defendant made to remedy the wrong and the opportunity or lack of opportunity plaintiff gave the defendant to remedy the wrong complained of (Ala. Code § 6-11-23(b)); the desirability of discouraging others from similar conduct; and the impact on innocent third parties. *Am. Emps. Ins. Co. v. S. Seeding Servs., Inc.*, 931 F.2d 1453,

1457 (11th Cir. 1991) Here, each claim results from Defendants′ actions of going onto Plaintiffs′ property and turning off utility services, with minimal difference between each specific incident. As such, all of Plaintiffs' claims are analyzed together.

1.  Harm from Defendants' Conduct

Weighing against Defendants is the relationship between the harm that occurred from Defendants′ conduct and the punitive damages. Here, Defendants′ conduct aimed to force Plaintiffs into having no choice but to comply with the excessive charges of Defendants or else be denied necessary utilities. Defendants also threatened criminal prosecution or foreclosure if Plaintiffs did not comply with Defendants′ charges. Plaintiffs had no real choice given those two options. The harm to Plaintiffs resulting from either criminal prosecution or foreclosure greatly exceeds the amount of punitive damages Defendants would currently pay.

Further, Defendants also offer a similar argument regarding the proportionality of the punitive damages to the amount in compensatory or nominal damages in the 1983 claims to show the awarded punitive damages are excessive. As discussed with the 1983 claims, when nominal damages are awarded, the proper ratio is between the harm caused to the plaintiffs and the punitive damages. Here, the ratio of the punitive damages is not excessive, as it aligns in a fair ratio with the actual harm suffered. Regarding the claim of outrage, in which Plaintiffs received compensatory

damages, the highest ratio is 10:1. While 10:1 is on the higher end, this court has upheld such a ratio in prior cases. *Brim v. Midland Credit Management, Inc.*, 795 F. Supp. 2d 1255, 1264 (N.D. Ala. 2011). As such, the relationship between the amount of harm and the amount in punitive damages weighs against remittitur.

### 2. Reprehensibility

For the same reasons discussed when determining whether the punitive damages violated federal law, the Court finds Defendants' actions tremendously reprehensible and worthy of the amount of punitive damages awarded.

### 3. Profitability

Because Defendants stood to profit based on their conduct also weighs against remittitur. Here, it is near impossible to imagine another reason why Defendants took the actions against the plaintiffs other than profit. Defendants sought to get some sort of compensation, either in the form of payments from Plaintiffs or, as threatened, by obtaining compensation through foreclosure or criminal proceedings. Once Defendants went onto Plaintiffs' property to turn off the utilities, Plaintiffs had no real choice other than to pay Defendants. Since there is no evidence that Defendants simply wanted to deprive Plaintiffs of utilities solely out of malice or hatred, profit is the only logical reason for their conduct.

### 4. Financial Position of Defendants

The strongest factor in favor of Defendants is the impact of the punitive damages on their financial position. Defendants point to the Alabama Supreme Court's language in *Green Oil*, which states that punitive damages should sting, not destroy. *Green Oil v. Hornsby*, 539 So.2d 218, 222 (Ala. 1989). Regardless of the calculation of the net worth of Defendants' businesses, the total punitive damages are currently $4,393,000. Such an award may, in fact, significantly hinder Defendants' ability to continue operating in their current state. Nevertheless, this factor alone does not make the punitive damages worthy of remittitur.

5. Costs of Litigation

Regarding the 1983 claims, the Davis Plaintiffs have requested attorney fees of $191,300.83. (Doc. 182.) And the Lawrence Plaintiffs have requested $168,210.83. The Court does not find that this factor weighs in favor of Defendants. Defendants argue that the amount of fees is evidence of Plaintiffs attempting to profit from the litigation. The Court disagrees.

6. Criminal Sanctions

No criminal sanctions have been brought against Defendants. For the reasons stated when analyzing the *Gore* factors, the unique circumstances of this case make this factor less relevant.

7. Other Civil Actions

No other civil actions have been brought against Defendants. For the reasons stated when analyzing the *Gore* factors, the unique circumstances of this case make this factor less relevant.

8.  Defendants' Attempt to Remedy Wrong

To show that Defendants' attempted to remedy the wrong, Defendants argue that they removed the liens placed on Plaintiffs' homes voluntarily "shortly before the trial commenced," did not press any criminal charges against Plaintiffs who they contend tampered with the water shut-off mechanisms, and that "each set of Plaintiffs has received essentially free sewer services for approximately four years." This is not enough to show that Defendants' attempted to remedy the wrong. Defendants would not take any partial payments when Plaintiffs attempted to pay them. During the trial, evidence demonstrated that Plaintiffs attempted to make partial payments by submitting checks each month to Defendants for what would have been the standard sewer charges. Defendants through counsel, rejected those payments each month by returning them. Each time, Defendants, through counsel, informed Plaintiffs that the entire balance, including all Defendants contended was owed, had to be repaid. Each time, Defendants' previous counsel added interest as well the attorney's fees that Defendants had incurred up to that point defending the litigation to their already outrageously excessive balance. Such amount was then

included as a lien on each of the plaintiffs' homes. This made Plaintiffs unable to sell their homes. Plaintiffs, who could not sell their homes because of the liens, became prisoners in their own homes without any recourse other than their suits. Plaintiffs' monthly sewer bills were only $92 per month. Plaintiffs' standard sewer charges over the four years, had Defendants not assessed outrageous fees, would have been approximately $4,416. Instead, as of May 3, 2021, Defendants claimed that over the four years: (1) the Davises owed $133,085.68; (2) the Lawrences owed $165,502.94; and (3) the Slones owed $179,614.00. Defendants did not attempt to remedy the wrong and this factor favors upholding the awarded punitive damages.

### 9.  Impact on Innocent Third Parties

The impact the punitive damages may have on innocent third parties may favor Defendants. Defendants provide necessary utilities to a community. If this court sustains the award, Defendants may choose to raise rates and spread the loss to average citizens. However, the punitive damages given, as discussed below, will discourage Defendants from doing such conduct to other persons in the community. Allowing Defendants to continue their conduct by reducing the jury's award, thus making their conduct financially beneficial to Defendants, cuts against the purpose of such damages. As a result, this factor does not mandate remittitur.

### 10. Desire to Discourage Conduct

Finally, the desire to prevent others from engaging in similar conduct as Defendants weighs heavily against remittitur. Defendants state that this factor does not weigh against remittitur since utility companies will simply not change their current practices. (Doc 199.) However, the current verdict would clearly deter similarly situated private sewer companies from doing this in the future. (*Id.*) As it stands, the punitive damages, in this case, would deter companies from doing similar actions. Further, the speculation by Defendants that even if companies who engage in similar conduct get notice of the risk of punitive damages, the ruling will not dissuade companies is illogical. Therefore, the desirability to discourage others weighs against remittitur.

### C. Defendants Are Not Small Businesses Under § 6-11-21(c)

"[I]n all civil actions where entitlement to punitive damages shall have been established under applicable law against a defendant who is a small business, no award of punitive damages shall exceed fifty thousand dollars ($50,000) or 10 percent of the business' net worth, whichever is greater." Ala. Code § 6-11-21(b). A "small business" means a "business having a net worth of two million dollars ($2,000,000) or less at the time of the occurrence made the basis of the suit." Ala. Code § 6-11-21(c).

Defendants state that under Ala. Code § 6-11-21(c), Defendants are a small business and are entitled to a cap on punitive damages. The dispute between Plaintiffs and Defendants regarding whether the statute should apply lies within the competing definitions of "net worth". Plaintiffs contend that net worth should be calculated by general accounting principles, a calculation given by Plaintiffs' expert, Don Woods. (Doc. 231 Ex. C). Woods's calculation shows that all Defendants' businesses exceed $2,000,000 in net worth. In contrast, Defendants contend that net worth should be calculated according to the definition given in Ala. 1975 § 40-14A-23(b), the Alabama Business Privilege and Corporation Shares Tax Act of 1999. Defendants provide a calculation through their expert, Ben Schillaci, that shows all Defendants' businesses are below $2,000,000. Therefore, to determine whether the cap on punitive damages applies, the Court must determine the appropriate definition of "net worth" within Ala. Code § 6-11-21(b).

### 1.   The Definition of Net Worth in § 6-11-21(c)

"The fundamental rule of statutory construction is that this Court is to ascertain and effectuate the legislative intent as expressed in the statute. *League of Women Voters v. Renfro*, 292 Ala. 128, 290 So.2d 167 (1974). In this ascertainment, *we must look to the entire Act instead of isolated phrases or clauses; Opinion of the Justices*, 264 Ala. 176, 85 So.2d 391 (1956)." *Darks Dairy, Inc. v. Alabama Dairy Comm'n*, 367

So.2d 1378, 1380 (Ala.1979). Further, when discerning legislative intent, a Court must look to the language of the statute. *Ex parte Waddail*, 827 So.2d 789, 794 (Ala. 2001). If the language, giving it its plain and ordinary meaning, is unambiguous, there is no further need for the court to provide construction. *Id.*

Within § 6-11-21(c), there is no mathematical calculation to determine what net worth should mean. "Net worth" stands alone, inviting conflicting definitions from the parties and their respective experts. Defendants ask this Court to accept the definition of net worth in Ala. § 40-14A-23(b). There, the definition comes within the larger statutory text of the Alabama Business Privilege and Corporation Shares Tax Act of 1999.  When determining privilege tax, net worth is "an amount equal to the sum, but not less than zero, of the capital accounts of the owners of the limited liability entity determined as of the first day of the taxable year of the entity" and includes "compensation, distributions or similar amounts paid or accrued to each direct or indirect partner or member to the extent the amounts exceed $500,000 with respect to each partner or member in the determination period." Ala. Code § 40-14A-23. Plaintiffs ask the Court to adopt the definition of net worth according to generally accepted accounting principles like Ala. Code § 8-7A-10. Generally accepted account principals instruct the Court to find the difference between Defendants' fair market value of assets and liquidation value of liabilities.

If the Court were to follow Defendants' proposed calculation, the Court would reach a faulty result. Defendants' expert, Schillaci, contends that Builder1.com, LLC and SERMA Holdings, LLC would have a net worth of $694,000. Further, Schillaci contends that Eco-Preservation Services, LLC would have a maximum net worth of $793,000. Allowing Defendants to escape from paying punitive damages when their conduct was reprehensible only because the Court applies a definition of net worth found in the tax code is an absurd result and against the intent of the Alabama legislature.

Further, Defendants incorrectly state that § 40-14A-23(b) is the only other place in the Alabama Code where net worth is defined. For example, the term "net worth" is used in §§ 8-7A-10; 11-51-154; 40-2A-7; and 11-51-191. Each of those uses provides a definition more like Plaintiffs' definition than the definition proposed by Defendants found in § 40-14A-23(b), in that each require net worth to be calculated by generally accepted accounting principles, basing net worth on fair market value, or as shown by an entities latest financial statement.

Given that § 6-11-21(c) regards a punitive damage cap, not issues of privilege taxes, the definition of net worth should be the most commonly accepted definition. Without direction by the Alabama legislature, a definition of net worth when calculating how much a company owes in privilege taxes is not the most commonly

accepted definition. The legislature, when enacting § 6-11-21(c), could have incorporated the definition in § 40-14A-23(b). However, the legislature did not. Given the silence on the definition, §§ 8-7A-10; 11-51-154; 40-2A-7; and 11-51-191 offer other guidance contradicting § 40-14A-23(b). All the above Code sections state that net worth is calculated based on fair market value or in accordance with generally accepted accounting principles.

Further, the Northern District in *Wilson v. Gillis Advertising Co.*, 145 F.R.D. 578, 582 (N.D. Ala. 1993) suggests that, within the same code section, net worth should be defined under general accounting principles. The combination of the Code's alternate definitions of net worth, the Northern District's approval of a similar definition within the structure of Ala. Code § 6-11-23 and the illogical nature of extending a one-off definition within the Privilege and Corporation Shares Tax Act to apply to a punitive damages cap all lend themselves to applying generally accepted accounting principles.

Even Defendants' expert admits that he did not calculate the net worth of Defendants. (Doc. 227-2 at 43.) Plaintiffs' counsel asked Defendants' expert, "In this case, what did you do to determine net worth?" (*Id.*) Defendants' expert responds, "Well, I didn't determine net worth . . . . I came up with an estimated valuation." (*Id.*) The relevant statutes in Alabama do not look to the valuation of the

company. The statute looks to net worth. Therefore, the Court will base its opinion on whether Defendants are small businesses using Plaintiffs' expert who followed generally accepted accounting principles when determining Defendants' net worth.

Thus, if by Plaintiff's expert's calculations Defendants' net worth is lower than $2,000,000, then the cap on punitive damages in § 6-11-21(c) will apply.

### 2. Defendants Are Not Small Businesses

Defendants filed a Motion to Strike stating that, even if the Court decides that Plaintiffs' definition of net worth is correct, the Court should not rely on Woods's calculations because they are based on the impermissible hearsay of Boozer Downs, attorney for the Town of Woodstock. This motion is due to be denied. Woods uses, against Defendants' assertions, multiple documents and figures to find Defendants' net worth.

When calculating his opinion, Woods' relied in part on the affidavit of Downs that states he had a conversation with Defendant Mike White where White verbally offered to sell the entire sewer system to the town of Woodstock Alabama for either $10 or $11 million. It also states that in 2009, White offered to sell the town just the sewer collection system for $3 Million. Woods incorporated Downs's statements when determining the value of the sewer system, a key component of the valuation of Defendants' businesses. While Down's affidavit may not be admissible, there is

no rule of evidence nor case law to prevent Woods from incorporating the affidavit into his analysis of the net worth of Defendants' businesses. It is reasonable for an accountant to rely on the value Defendant White would be willing to sewer collection system when determining fair market value of the asset. Plaintiff does not aim to introduce Downs' affidavit into evidence, nor does Woods solely use Downs's affidavit to calculate net worth. Along with tax returns and other exhibits, Woods uses the affidavit to obtain a reasonable figure for the sewer system Defendants own. Therefore, as Woods's calculation follows the appropriate calculation of net worth, and the evidence used to calculate the net worth against Defendants' assertions is appropriate, his calculation is the correct formulation.

a) Defendant SERMA Holdings, LLC & Builder1.com, LLC

Builder1.com, LLC is part of SERMA. Thus, both parties analyzed SERMA Holdings, LLC only. The report of Woods states the appropriately calculated net worth of SERMA Holdings. In 2017, at the time of the occurrence, the net worth of SERMA Holdings LLC was above $2,000,000. (Doc. 231 Ex. C). Further, since 2017, SERMA's net worth has never been below $2,000,000. (*Id.*) Therefore, SERMA Holdings is not a small business under § 6-11-21(c).

b) Defendant Eco-Preservation Services LLC

The report of Woods states the appropriate and accurate net worth of Eco-Preservation Services. At the time of the occurrence, the net worth of Eco-Preservation Services LLC was above $2,000,000. (Doc. 231 Ex. C). Further, since 2017, Eco-Preservation Services' net worth has never been below $2,000,000. (*Id.*) Therefore, Eco-Preservation Services is not a small business under § 6-11-21(c).

Since none of Defendants' businesses are below $2,000,000 in net worth, the businesses are not subject to the cap on punitive damages in § 6-11-21(c). Further, Defendants' arguments regarding the definition of "occurrence" are irrelevant since Defendants would need to be subject to the cap on punitive damages to dispute such an issue.

## III.  CONCLUSION

Given that neither the *Gore* factors nor *Hammond/Green Oil* factors weigh in favor of remittitur, the Court sustains the award of punitive damages against Defendants. Further, as to Defendants SERMA, Builder1, and Eco-Preservation LLC, the small business cap § 6-11-21(c) does not bar the current amount in punitive damages. Defendants' net worth exceeds $2,000,000 under the appropriate calculation, and Defendants are not small businesses.

Defendants' Motion for Remittitur and Motion to Strike is **DENIED.** The case is **ORDERED** to remain closed.

**DONE** and **ORDERED** on August 3, 2022.

_____

L. Scott Coogler
United States District Judge

206888